IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NIQUINE PARRISH** | : | **CIVIL ACTION** |
| | : | |
| v. | : | NO.  22-4552 |
| | : | |
| **COUNTY OF DELAWARE** | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                                          **July 3, 2024**

      The plaintiff is a correctional officer who worked at a prison for quite a while. Eventually, the correctional officer's medical problems necessitated an accommodation under the Americans with Disability Act: workdays capped at 8 hours.  When she initially requested this accommodation, the private entity running the prison granted it.  But then Delaware County took over the prison from the private entity and required the correctional officer to work mandatory overtime.  The correctional officer once again requested an accommodation under the ADA, which the county briefly considered, but ultimately terminated her and others who made similar requests.  So she brought this litigation.

      The County moves for summary judgment.  It argues that the undisputed facts show that it lawfully terminated the correctional officer because she couldn't work mandatory overtime, which was an essential function of the correctional officer position.  We don't agree, so we deny its motion for summary judgment.  All of the correctional officer's claims will proceed to trial.

1

I.      **Factual Background**[1]

Plaintiff Ms. Niquine Parrish worked at the George Hill Correctional Facility ("facility") as a correctional officer from 2005 through her eventual termination in 2022.  DI 21-3 ¶ 1; DI 22 ¶ 1.  In 2017, she took a medical leave of absence from work.  DI 21-3 ¶ 2; DI 22 ¶ 2.  Her conditions included "lumbar and cervical herniated discs, cervical and lumbar radiculopathy, cervical/thoracic/lumbar facet syndrome, bilateral knee osteoarthritis and sacroiliitis."  DI 21-3 ¶ 5; DI 22 ¶ 5.  In 2018 she returned to work with a medical accommodation: workdays capped at 8 hours with no mandatory overtime.  DI 21-3 ¶ 3; DI 22 ¶ 3.  She worked from 2018 until 2020 with this accommodation in several units of the facility, including "on the blocks and in the control room."  DI 21-3 ¶ 3; DI 22 ¶ 3.  In 2021, she was assigned to the "Ion Station" where she continued to work 8-hour days without mandatory overtime.  DI 21-3 ¶ 4; DI 22 ¶ 4.  During this time, an entity called "Geo Group, Inc." ("Geo") ran the facility and made all relevant staffing decisions.  DI 18-1 ¶¶ 2-3; DI 21-2 ¶¶ 2-3.  While operating the facility near the end of Ms. Parrish's tenure there, Geo "faced problems with employee absences and call-outs" and staffing shortages among correctional officers, though Ms. Parrish did not contribute to these problems because she showed up on time for all her shifts and did not call out.  DI 18-1 ¶¶ 4, 18; DI 21-2 ¶¶ 4, 18.

---

[1] We draw these facts from (1) the County's statement of material facts (DI 18-1 at 4-14 (ECF)) admitted or undisputed in Ms. Parrish's opposition, (2) Ms. Parrish's response to the County's statement of facts (DI 21-2 at 1-13 (ECF)), (3) her supplemental statement of facts (DI 21-3 at 1-9 (ECF)) and the County's response (DI 22 at 1-9 (ECF)), and (4) the miscellaneous record items filed with the parties' briefs.  The parties refer to the record by Bates number, which is particularly unhelpful.  We do not adopt this convention and instead refer to these documents by their ECF pagination.

In "early 2022" Geo's employees were advised that defendant County of Delaware (the "County") was to take over the facility from Geo on April 6, 2022, and as a result, their jobs with Geo would be terminated.  DI 18-1 ¶ 7; DI 21-2 ¶ 7; DI 18-2 at 638 (ECF).  One of the reasons the County took over the facility was the staffing shortage.  DI 18-1 ¶ 18; DI 21-2 ¶18.  Before the County took over, "the County sought individuals, including those employed by GEO, for positions under its employ, including employees in the position of correctional officer" and enlisted a third party to assist with these efforts.  DI 18-1 ¶¶ 5-6; DI 21-2 ¶¶ 5-6.

The County hired Ms. Parrish as a correctional officer effective April 6, 2022, along with approximately 80% of the former Geo correctional officers who applied for positions with the County.  DI 21-3 ¶ 8; DI 22 ¶ 8; DI 18-1 ¶ 8; DI 21-2 ¶ 8.  The County also hired at least one former Geo human resources specialist: Ms. Angela Frattarelli, who previously facilitated the approval of Ms. Parrish's accommodations request.  DI 18-1 ¶¶ 14-15; DI 21-2 ¶¶ 14-15.

During this period of transition, County employee Warden Laura Williams ("the Warden") got up to speed on the "day-to-day operations" at the facility, including staffing concerns and job duties.  DI 18-1 ¶¶ 12-13; DI 21-2 ¶¶ 12-13.  Consequently, the County required most newly hired correctional officers to be able to work mandatory overtime to address safety concerns caused by staff shortages.[2]  To that end, the job description for correctional officers hired by the County stated that they must be "available for mandatory or volunteer

---

[2] DI 18-1 ¶¶ 19-20, 22-24; DI 21-2 ¶¶ 19-20, 22-24.  There is a genuine dispute of fact as to whether all correctional officers were required to work mandatory overtime, as Ms. Parrish provides evidence that some correctional officers were not mandated to work overtime.  *See infra.*  But Ms. Parrish does not dispute that the County's requirements regarding mandatory overtime were designed to address a staff shortage, or that staffing shortages impacted "overall safety" at the facility.  DI 18-1 ¶¶ 18, 24; DI 21-2 ¶¶ 18, 24.

overtime to support necessary staffing of the facility" and able "to work up to sixteen (16) hours within a rolling 24-hour period." DI 18-1 ¶ 21; DI 21-2 ¶ 21.

Ms. Parrish applied for a correctional officer position with the County and interviewed. DI 18-1 ¶¶ 43-44; DI 21-1 ¶¶ 43-44. To "save her job at the [facility]" in her interview, Ms. Parrish affirmed her willingness to work mandatory overtime and assented to the County's description of mandatory overtime as an essential function[3] of the position. DI 18-1 ¶¶ 44-47; DI 21-2 ¶¶ 44-47. The County offered her the position effective April 6, 2022, in a written letter that stated, among other things, that mandatory overtime was an essential duty of correctional officers under its employ. DI 18-1 ¶¶ 49-50; DI 21-2 ¶¶ 49-50. She signed the letter and accepted the job. DI 18-1 ¶ 51; DI 21-2 ¶ 51.

Ms. Parrish began working for the County as a correctional officer posted at the "Ion Station." DI 18-1 ¶ 55; DI 21-2 ¶ 55. When the County took over from Geo, overtime assignments worked like this: each shift, supervisors would inform the correctional officers working that shift of the number of vacancies on the following shift and they could volunteer to cover those vacancies as overtime. DI 18-1 ¶¶ 30-32; DI 21-2 ¶¶ 30-32. After volunteers were assigned to vacancies, remaining spots were filled by mandating overtime to other correctional officers. *Id.* But it was "permitted practice" at the facility — indeed "common and acceptable" — for correctional officers to get other correctional officers to cover their mandated overtime instead of working it themselves.[4]

---

[3] There is a genuine dispute of fact as to whether the ability to work mandatory overtime was an essential function of the correctional officer position under the County. *See infra.*

[4] DI 21-3 ¶¶ 12-13; DI 22 ¶¶ 12-13. The County unsuccessfully describes this fact as "[d]isputed as stated" by arguing that "[o]btaining coverage for mandated overtime shifts was problematic," because such coverage arrangements "could be problematic" or "could [] be an issue." DI 22 ¶ 13 (citing DI 18-1 ¶¶ 25-26). Even if true, that does not raise a dispute as to Ms.

Within days of hiring Ms. Parrish, the County began mandating her overtime beyond 8 hours per day. DI 21-3 ¶ 9; DI 22 ¶ 9. So Ms. Parrish paid other correctional officers to cover her mandatory overtime assignments. DI 18-1 ¶ 58; DI 21-2 ¶ 58. And hoping to return to her previously accommodated status, she provided the County with a note from her physician indicating that she could not work over 8 hours per day. DI 21-3 ¶ 11; DI 22 ¶ 11. She submitted ADA "paperwork" including a form completed by her physician. DI 18-1 ¶¶ 61-64; DI 21-2 ¶¶ 61-64. She formally requested an accommodation under the ADA in the nature of "work[ing] no more than [8] hours per day." DI 18-1 ¶ 67; DI 21-2 ¶ 67.[5] Consequently, the County conducted an "interactive process" meeting with Ms. Parrish on May 5, 2022, to discuss her request. DI 21-3 ¶¶ 41-42; DI 22 ¶¶ 41-42. At that meeting, nobody from the County proposed alternative accommodations or informed Ms. Parrish about available alternative non-correctional officer jobs. DI 21-3 ¶¶ 40-46; DI 22 ¶¶ 40-46. This is because "once it was determined that [Ms. Parrish] could not work mandatory overtime, there was no further investigation into possible accommodations." DI 21-3 ¶ 46; DI 22 ¶ 46. The County terminated Ms. Parrish on May 25, 2022. DI 21-3 ¶ 14; DI 22 ¶ 14. Before that, Ms. Parrish did not call out or fail to show up for work while employed by the County. DI 21-3 ¶ 28; DI 22 ¶ 28. And correctional officers who did not call out or fail to show up for work did not contribute to the staffing shortage at the facility. DI 21-3 ¶ 27; DI 22 ¶ 27. Staffing shortages at the facility remain until this day. DI 21-3 ¶ 32; DI 22 ¶ 32.

---

Parrish's contention that correctional officers were permitted to obtain coverage for their mandated overtime assignments and did so frequently.

[5] The parties vigorously dispute whether Ms. Parrish inquired or requested to transition to a "non-correctional officer position" that would not involve mandated overtime, and what County staff did or told her in response. DI 18-1 ¶ 72; DI 21-2 ¶ 72; DI 21-3 ¶¶ 6-7, 15; DI 22 ¶¶ 6-7, 15. Thus, there is a genuine dispute of fact as to this issue.

In November of 2022, Ms. Parrish brought this litigation, alleging various claims under the ADA and Pennsylvania Human Relations Act (PHRA).  DI 1.

II.     **Motion for Summary Judgment**

The County filed a motion for summary judgment on each of Ms. Parrish's claims.  DI 18.  Ms. Parrish opposed (DI 21) and the County replied (DI 22).  The County's motion is thus ripe for disposition.

The County first seeks summary judgement on Ms. Parrish's failure to accommodate claim on the grounds that she was not a "qualified individual" under the ADA because she couldn't perform an essential function of the correctional officer job: working mandatory overtime.  DI 18-3 at 6 (ECF).  The County also argues that even though it did engage in the interactive process as required by the ADA, there were no reasonable accommodations for Ms. Parrish at the facility.  *Id.* at 6-7 (ECF).  The County also seeks summary judgment on Ms. Parrish's retaliation claim because she has not shown a prima facie case of retaliation or pretext.  *Id.* at 7 (ECF).

Ms. Parrish argues in opposition that summary judgment is not proper on her accommodation claim because there is a dispute of fact as to whether mandatory overtime is an essential function of the correctional officer position.  DI 21-5 at 16 (ECF).  She also argues that there were reasonable accommodations available at the facility, and thus the County violated the ADA by failing to engage in the interactive process and/or offer her a reasonable accommodation.  *Id.* at 20-25 (ECF).  Finally, Ms. Parrish argues that there are factual disputes sufficient to forestall summary judgement on her claim for retaliation.  *Id.* at 27 (ECF).  We agree with Ms. Parrish that the competing evidence here requires the submission of her claims to a jury.

### III. Standard of Review

The Federal Rules of Civil Procedure require summary judgment movants to "show[] that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) ("[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit.").  And a "genuine dispute" over a material fact means "a reasonable jury could return a verdict for" the party not moving for summary judgment. *Anderson*, 477 U.S. at 248.  In deciding whether a genuine dispute of material fact exists, we must view "the evidence in the light most favorable to the nonmovant." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *see Young v. Martin*, 801 F.3d 172, 174 n.2 (3d Cir. 2015).  We may not "weigh the evidence [or] assess its veracity." *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021).

### IV. Analysis[6]

   a. There are genuine disputes of material fact as to whether Ms. Parrish is a qualified individual under the ADA.

To establish a claim for discrimination under the ADA, the plaintiff must first show that they are "qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).  "'Whether a particular function is essential is a factual determination that must be made on a case-by-case basis.'" *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 279 (3d Cir.2001) (quoting EEOC Interpretive Guidance on Title I of the

---

[6] Ms. Parrish's PHRA claims are coextensive with her ADA claims, so our analysis is the same. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

Americans with Disabilities Act, 29 C.F.R. pt. 1630, App. 1630.2(n) (2000)).  Evidence that a particular function is essential includes, among other things, "[t]he employer's judgment as to which functions are essential; [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; . . . [t]he consequences of not requiring the incumbent to perform the function; [t]he work experience of past incumbents in the job; and/or [t]he current work experience of incumbents in similar jobs."  *Skerski*, 257 F.3d at 279 (citing 29 C.F.R. § 1630.2(n)(3)).

Here, the County argues that it is beyond dispute that mandatory overtime was an essential function of the correctional officer position at the facility, at least when it took over in April of 2022, based on safety and operations issues caused by staff shortages at the facility.  DI 18-3 at 10 (ECF).  It cites evidence that it described mandatory overtime as an essential function to Ms. Parrish when it provided her the job description, interviewed, and hired her.  *Id.* at 11-12 (ECF).

True enough, a function *may* be considered essential "because of the limited number of employees available among whom the performance of that job function can be distributed."  29 C.F.R. §1630.2(n)(2)(ii).  And an employer's categorization of a function as essential *may* indicate that it is.  *Id.* § 1630.2(n)(3).  And courts have recognized mandatory overtime as an essential function amidst safety concerns and employer descriptions of the function as essential.  *See, e.g., Gavurnik v. Home Props.*, L.P., 712 F. App'x 170, 171 (3d Cir. 2017) (overtime snow removal an essential function of a service technician position because it was listed in the job description and unremoved snow presented safety issue); *Smith v. Burlington County of New Jersey*, 2004 WL 1932850 (D.N.J. July 27, 2004) (overtime is an essential function for corrections officer where standard operating policies and written collective bargaining agreement

8

identify mandatory overtime as essential function, testimony of officials indicate overtime as an important component of the job, and plaintiff stated they were informed the position required overtime).

But an employer's description of a function as essential to a job is not "conclusive," and employers may not convert all *requirements* of a job into *essential functions* simply by describing them as such. *Tish v. Magee-Women's Hosp.*, 2008 WL 4790733, at *14 (W.D. Pa. Oct. 27, 2008); *Johnson v. McGraw-Hill Cos.*, 451 F. Supp. 2d 681, 704 (W.D. Pa. 2006); *see also Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 329 (3d Cir. 2003). And Ms. Parrish's "own experience in the [correctional officer] position is relevant" to our inquiry too. *Johnson*, 451 F. Supp. 2d at 704 (denying summary judgment on essential function inquiry where plaintiff adduced evidence that he had been able to do his job in years prior without performing physically demanding actions that his employer described as essential functions). So is the experience of her former correctional officer colleagues. 29 C.F.R. § 1630.2(n)(3). And considering these factors on Ms. Parrish's record, a reasonable juror could decide that mandatory overtime was not an essential function of the correctional officer position. Specifically, there is competing evidence from which reasonable jurors could conclude that: 1) not all correctional officers were mandated to work overtime at the facility, even after the County took over;[7] it was

---

[7] Ms. Parrish offers evidence that some correctional officers did not work any or significant amounts of overtime after the County took over. DI 21-5 at 17 (ECF); DI 18-1 ¶ 19; DI 21-2 ¶ 19; DI 21-3 ¶ 10; DI 22 ¶ 10. The County argues that these correctional officers were not similarly situated to Ms. Parrish for various reasons, so their lack of overtime should be zeroed out of our analysis. DI 22-1 at 10 (ECF). Not so. These are material facts in genuine dispute requiring resolution by a jury. *See, e.g.*, *Skerski*, 257 F.3d at 280 (cautioning against premature determination on essential function inquiry where at least some of the factors set forth in C.F.R. §1630.2(n) lean in plaintiff's favor); *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 613 (3d Cir. 2006) (similar).

"acceptable" practice at the facility, even under the County, for correctional officers to find coverage for assigned overtime shifts instead of working them (DI 21-3 ¶ 13; DI 22 ¶ 13); 3) Ms. Parrish had successfully performed the correctional officer position for years[8] without working mandatory overtime (DI 21-3 ¶¶ 3, 4; DI 22 ¶¶ 3, 4); and 4) the "consequences of not requiring [Ms. Parrish] to perform the function of mandatory overtime" could be insignificant.[9] *See ADA Anglemeyer v. Ammons*, 92 F.4th 184, 190 (3d Cir. 2024) (competing evidence constitutes a "classic factual dispute" appropriate for resolution at trial); *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (same). This being the case, there are genuine disputes of fact pertaining to whether mandatory overtime was an essential function of the correctional officer position, and thus, whether Ms. Parrish was qualified under the ADA.

b. <u>There are genuine disputes of material fact as to whether the County violated the ADA by failing to offer Ms. Parrish reasonable accommodations.</u>

Under the ADA, employers have a duty to make reasonable accommodations for disabled employees. *Lewis v. Univ. of Pa.*, 779 F. App'x 920, 923 (3d Cir. 2019) (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504-05 (3d Cir. 2010)). An employer breaches this duty by "failing to

---

[8] The County argues that Ms. Parrish's prior experience in the correctional officer position is not relevant to our inquiry because it was under a different employer at the same facility. DI 22-1 at 9 (ECF). Again, we think this a genuine dispute of material fact most appropriate for resolution by a jury.

[9] A reasonable juror could certainly figure that allowing Ms. Parrish (who did not miss assigned shifts and always found coverage for her overtime shifts) an exemption from the mandatory overtime requirement would have less significant consequences on the facility's staffing concerns than terminating her. Indeed, she shows evidence that the County's staffing problems persisted well beyond her termination. DI 21-3 ¶ 32; DI 22 ¶ 32.

10

provide an accommodation that is reasonable or by failing to engage in a good faith interactive process to identify accommodations." *Id.* (citing *Taylor*, 184 F.3d at 317-18. To establish a prima facie case under the ADA for failure to accommodate or engage in the interactive process, a plaintiff must show that they "could have been reasonably accommodated." *Capps v. Modelez Global LLC*, 847 F. 3d 144, 157 (3d Cir. 2017); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004). On summary judgment, a plaintiff need only identify an accommodation that on its face does not cost more than its benefits. *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir. 1999). If successful, the burden switches to the defendant to show that the proposed accommodation is unreasonable or would create undue hardship. *Id.* Under this framework, courts grant summary judgment for defendants on failure to accommodate claims only where the plaintiff's proposed accommodation is "clearly ineffective or outlandishly costly." *Id.* (cleaned up). Further, "[g]enerally, the question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002).

Here, the County argues that there was no reasonable accommodation for Ms. Parrish at the facility because to exempt her from mandatory overtime assignments would have "caused unpredictability with regard to appropriate staffing." DI 18-3 at 16 (ECF). But Ms. Parrish proposes two specific accommodations: the County could have reassigned her to a vacant non-correctional officer position that did not require mandatory overtime, or it could have permitted her to continue seeking coverage for her mandatory overtime shifts by fellow correctional officers. DI 21-4 at 23-26.

The County argues in response that neither suggested accommodation was reasonable. DI 22-1 at 12 (ECF). It first argues that Ms. Parrish "does not cite any applicable authority that,

11

as a new employee, reassigning her was a reasonable accommodation" and states that "case law and EEOC guidance have established that a newly-hired employee — who was never able to perform the essential functions of her position — is not entitled to reassignment as a reasonable accommodation."  DI 22-1 at 12 (ECF).  Maybe true, but as discussed above, there remains a factual dispute as to whether mandatory overtime constitutes an essential function here.  And further, the County dodges its burden.  Our inquiry is whether reassignment of Ms. Parrish to a different position would be "clearly ineffective" or "outlandishly costly."  *Walton*, 168 F.3d at 670.  The County makes no argument that it would be, and the record doesn't show otherwise.

     Next, the County argues that permitting Ms. Parrish to obtain coverage for her mandatory overtime shifts was not a reasonable accommodation because such an arrangement on an indefinite basis would "pose a risk to covering overtime slots because it [would] take[] away from the pool of available correctional officers per shift" and affect assignments "shift to shift, day to day."  DI 22-1 at 13 (ECF).  But we think that on Ms. Parrish's record, a reasonable juror could disagree.  Ms. Parrish shows evidence that it was "permitted" and "common and acceptable" practice at the facility for correctional officers to obtain coverage for their mandatory overtime shifts.  DI 21-3 ¶ 13; DI 22 ¶ 13.  And the County had no policy against it, despite its motivation and ability to change other staffing practices to account for safety and operational concerns when it took over the facility.  DI 22-1 at 13 (ECF); DI 18-1 ¶ 19; DI 22-2 ¶ 19.  This being the case, we do not think that the County has shown that permitting Ms. Parrish to obtain coverage for her mandatory overtime shifts would be "clearly ineffective" or "outlandishly costly."  *Walton*, 168 F.3d at 670.

Therefore, we decline to grant summary judgement in favor of the County based on its argument that it could not have reasonably accommodated Ms. Parrish.

      c.  <u>There are genuine disputes of fact as to whether the County failed to engage in the interactive process.</u>

An employer can also breach its duty to accommodate under the ADA by "failing to engage in a good faith interactive process to identify accommodations." *Lewis*, 779 F. App'x at 923 (citing *Taylor*, 184 F.3d at 317-18). To state a claim for failure to participate in the interactive process a plaintiff must allege: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d 296, 319 (3d Cir. 1999); *Williams*, 380 F.3d at 772. "[W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." *Lewis*, 779 F. App'x. at 923.

Employers can demonstrate good faith "in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor*, 184 F.3d at 317. For example, an employer cannot win summary judgment on an interactive process claim where there is evidence that it "issued a flat denial" of a plaintiff's requested accommodations without "making any effort to communicate with [the plaintiff] regarding [their] needs." *Lewis*, 779 F. App'x at 923. But in contrast, where an employer engages in "the good faith steps identified in *Taylor*," a plaintiff's "pure speculation" that the employer's accommodation denial was

13

"predetermined in bad faith" does not establish a factual dispute sufficient to preclude summary judgment, especially where the plaintiff unilaterally ended the interactive process.  *Doyle v. Senneca Holdings, Inc.*, 2022 WL 1239501, at *8 (W.D. Pa. Apr. 27, 2022).  Further, "[t]he interactive process does not dictate that any particular concession must be made by the employer," *Taylor*, 184 F.3d at 317, and in fact, all it requires "is that employers make a good-faith effort to seek accommodations."  *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009) (quoting *Taylor*, 184 F.3d at 317).

Here, Ms. Parrish argues that the County did not engage in the interactive process in good faith because it held only one perfunctory thirty-minute meeting in response to her accommodations request, during which it did not suggest any alternative accommodations.  DI 21-5 at 22 (ECF).  Further, Ms. Parrish offers undisputed evidence that "once it was determined that [Ms. Parrish] could not work mandatory overtime, there was no further investigation into possible accommodations."  DI 21-5 at 23 (ECF).  The County argues that Ms. Parrish cannot maintain an interactive process claim because she could not have been accommodated.  DI 22-1 at 12 (ECF).  This argument remains unpersuasive given the factual disputes identified above.

The County also argues that it showed good faith by seeking out additional information from Ms. Parrish's medical provider upon her accommodations request, meeting with her to discuss her limitations, and considering her request.  DI 22-1 at 11 (ECF).  Though these facts may be indicia of having digested Ms. Parrish's request for accommodations, they do not show that the County made a good faith effort to *seek* accommodations for her in response. *Hohider*, 574 F.3d at 187 (quoting *Taylor*, 184 F.3d at 317).  Indeed, the County admits that once it determined she could not perform mandatory overtime, it did not investigate alternative accommodations.  DI 21-3 ¶ 46; DI 22 ¶ 46.  From this, we think a reasonable juror could infer

14

that the County did not engage in the interactive process in good faith. As such, we decline to grant the County's motion for summary judgment as to Ms. Parrish's interactive process claim.

      d. <u>There are disputes of fact as to whether the reasons offered by the County for Ms. Parrish's termination were pretext for retaliation.</u>

Employers violate the ADA by taking adverse action against an employee based on the employee's protected conduct; these are called "retaliation claims." *Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir. 2000). ADA retaliation claims follow the familiar *McDonnell Douglas* burden shifting framework. *Shaner*, 204 F.3d at 500-01 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this tripartite framework, if a plaintiff succeeds in establishing a prima facie retaliation claim under the ADA,[10] the burden of production then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse action. *Id.* (citing *Jones v. Sch. Dist.*, 198 F.3d 403, 410 (3d Cir. 1999)). If the defendant succeeds, the plaintiff must show that the articulated reason was pretext for a discriminatory motive. *Id.* Though the burden of production shifts to the defendant during the second step, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* "Most cases" turn on a plaintiff's ability to establish pretext. *Id.* To establish pretext on summary judgment, a plaintiff must point "to some evidence direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory

---

[10] To establish a prima facie retaliation claim, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Shaner*, 204 F.3d at 500-01.

reason was more likely than not a motivating or determinative cause of the employer's action." *Jones*, 198 F.3d at 413 (cleaned up).

Ms. Parrish states a prima facia cause of action for retaliation because she advances facts showing that she requested an accommodation under the ADA[11] and was subsequently terminated because that accommodation was not acceptable to the County.  DI 21-3 ¶¶ 57-63; DI ¶¶ 57-63.  The County concedes as much.  DI 22-1 at 13-14 (ECF) ("The County terminated [Ms. Parrish's] employment based upon [her] own actions – she requested an accommodation which could simply not be granted due to the essential need for her to work mandated overtime.").  Thus, it cannot be said, as the County asserts,[12] that there is no *causal* relationship between her request for accommodations and her termination, as all parties agree that the first caused the latter.  *Shaner*, 204 F.3d at 500-01.  Further, the short period of time between the County's takeover, Ms. Parrish's request for accommodations, and her termination could suggest retaliatory intent sufficient to forestall summary judgment.[13]

Having stated a prima facia case for retaliation, the burden switches to the County to offer a legitimate, non-discriminatory reason.  *Shaner*, 204 F.3d at 500-01.  Though the County identifies Ms. Parrish's "inability to perform the essential functions of her position" as its

---

[11] Requesting an accommodation under the ADA is a protected activity, and the parties do not argue otherwise.  42 U.S.C. § 12112(b)(5)(A); *Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 41 (3d Cir. 2018).

[12] DI 22-1 at 13 (ECF).

[13] *Id.* at 505.  The County argues that the "temporal proximity" here is a "red herring" and cannot establish causation alone.  DI 22-1 at 13 (ECF).  As an initial matter, our ruling that Ms. Parrish has stated causation for purposes of a prima facie case of retaliation does not rest solely on the temporal proximity between her accommodations request and her termination.  And second, temporal proximity is not a mere "red herring."  It is a recognized logical indicator of retaliatory intent.  *See, e.g.*, *Shaner*, 204 F.3d at 505; *Kazar v. Slippery Rock Univ. of Pa.*, 679 F. App'x 156, 161 (3d Cir. 2017); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

legitimate, non-discriminatory reason for terminating her, we already established that a jury may disagree with that reason. DI 18-3 at 21 (ECF). And even if the County did successfully offer a legitimate non-discriminatory reason for terminating her, Ms. Parrish offers sufficient evidence of pretext to establish a genuine dispute of fact regarding her retaliation claim.

Ms. Parrish testified that "it was known" to correctional officers that the new Warden "had an agenda" and "was coming after those who worked at the [facility] with FMLA and ADA restrictions." DI 21-5 at 27 (ECF). Specifically, she testified that even before the County took over the facility, she and other staff had the impression that the Warden "knew" which correctional officers had accommodations pertaining to mandatory overtime and "d[id]n't care about a lawsuit, she[] [was] ready" to "get rid of" individuals with ADA accommodations. DI 18-1 at 591-92 (ECF). Ms. Parrish testified that the County terminated her as an "example" to other staff who wanted to request mandatory overtime exemptions. *Id.* And Ms. Frattarelli testified that the County dismissed all individuals who had requested an ADA accommodation in the nature of mandatory overtime exemptions. DI 18-2 at 117-118 (ECF). The County waves away this evidence as "self-serving" and not reasonably believable. DI 22-1 at 14 (ECF). But we are not to weigh evidence on summary judgment or assess its truthfulness. *Clews*, 12 F.4th at 358. And we think that a reasonable juror could infer from Ms. Parrish's facts that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [County's] action" here. *Jones*, 198 F.3d at 413. Thus, we deny summary judgment on Ms. Parrish's retaliation claim.

## V. **Conclusion**

For the reasons discussed above, we deny the County's motion for summary judgment in its entirety. All of Ms. Parrish's claims proceed to trial.